# UNITED STATES DISTRICT COURT
EASTERN    DISTRICT OF    CALIFORNIA

—oOo—



**FILED**
FEB 2 1 2012
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY CLERK

UNITED STATES OF AMERICA
v.
Daniel Chartraw

**CRIMINAL COMPLAINT**

CASE NUMBER:

(Name and Address of Defendant)

2:12 - MJ - 51 — KJN —

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about **November 22, 2010 and June 7, 2011** in **El Dorado** County, in the Eastern District of California defendant did,

▸

having devised a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, or promises, transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice

in violation of Title **18**, United States Code, Section(s) **1343**. I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

▸ **See Attached Affidavit of Richard Snodgrass**

Continued on the attached sheet and made a part of this complaint:   **X**

_____
Signature of Complainant Richard J. Snodgrass
Federal Bureau of Investigation

Sworn to before me, and signed in my presence

February 21, 2012                    at    Sacramento, California

Date                                          City        State

Kendall J. Newman, U.S. Magistrate Judge

_____
Signature of Judge

Name of Judge    Title of Judge

## Affidavit of Richard Snodgrass

I, Richard J. Snodgrass, being duly sworn, do depose and state the following:

### I.   Background

1. I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI) since November of 1984 and am currently assigned to the white collar crime squad of the Sacramento office of the FBI. My duties involve the investigation of financial crimes.

2. During my employment with the FBI, I have participated directly and indirectly in hundreds of investigations regarding white collar criminal violations, including but not limited to, wire fraud, mail fraud, securities fraud, health care fraud, private insurance fraud, public corruption, fraud against the government, money laundering, and computer related fraud.

3. I have received training in white collar criminal investigative techniques and have taught classes in money laundering, forfeiture, and white collar crime investigation techniques at the FBI Academy at Quantico, Virginia, and elsewhere.

4. Based on my personal participation, including my review of documents, I am familiar with the facts and circumstances of this investigation. The information set forth in this affidavit reflects my personal knowledge based on my review of documents and interviews with persons connected to the investigation, and, in conjunction with my training and experience as an FBI Agent, form the basis of the opinions and conclusions set forth below. This affidavit is being submitted for the limited purpose of securing authorization to arrest an individual, therefore, I have not included each and every fact

1

known to me concerning this investigation. Where necessary to protect the privacy of financial information and those involved in the investigation, I have used initials rather than full names, the letter "X" in place of numbers or letters, and brackets to reflect abbreviations.

## II. Violations

5. This affidavit seeks to establish probable cause for the issuance of a criminal complaint and arrest warrant for Daniel Chartraw for violations of Title 18, United States Code, Section 1343, Wire Fraud. In summary, 18 U.S.C. § 1343 makes it a crime to having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmit or cause to be transmitted by means of wire, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme.

## III. Overview

6. In approximately May 2011, Daniel Chartraw, convinced two individuals, H.G. and J.C., to wire him $75,000 (on June 7, 2011) and $25,000, respectively, by stating that he needed a loan in order to make a lease payment on a piece of mining equipment. As security for the loan, Chartraw provided his victims a Bill of Lading and claimed that he sent $300,000 worth of gold as security. The Bill of Lading was later found to be fraudulent and Chartraw never repaid the money. Moreover, the money was largely spent by Chartraw on a Cadillac, not a piece of mining equipment.

7. In approximately November 2010, Daniel Chartraw and Leslie Gilbert falsely claimed that they were officers of AZ Rock Holdings and that they needed investment money in order to refine Dore

2

1  bars and extract the precious metals from them. As a result, victim
2  J.F.C. wired $1,000,000 (on November 22, 2010) to an account
3  controlled by Chartraw. Although this account purported to be for the
4  benefit of AZ Rock, the money was largely distributed to other
5  accounts controlled by Chartraw and Gilbert and was not used to refine
6  metals.

## IV.   Statement of Probable Cause

**The Mining Equipment Loan:**

8.   In July of 2011, H. G., a resident of New York state, contacted the Federal Bureau of Investigation (FBI), to lodge a complaint regarding an alleged fraud committed by Daniel Chartraw. Chartraw is a former resident of El Dorado Hills, California, the subject of several pre-existing accusations of fraud, and was, at the time, a target of a pending FBI investigation opened in the Sacramento division.

9.   H.G. told me that Chartraw had been referred to him by a business associate by the name of J.C. in approximately May 2011. J.C. told H.G. that Chartraw owned a gold mining operation and that Chartraw desired to borrow, on a short term basis, a sum of money to use for a lease payment on a piece of mining equipment and that Chartraw was offering to transfer a quantity of gold as collateral. H.G. called Chartraw to inquire further.

10.   Chartraw told H.G. he wanted to borrow $75,000 from H.G. in order to make a lease payment on gold refining machinery he was using at one of the mines that he owned. He told H.G. that if he lost the machinery he would be out of production at his mine. In return for the loan, Chartraw promised to repay the loan within five days, plus an additional amount equal to 6% of the amount loaned.

3

1 | Chartraw told H.G. he would provide collateral for the loan in the
2 | form of $300,000 worth of gold bars that he was currently shipping to
3 | J.C. in New York. J.C. was to hold the gold bars as collateral.
4 | Chartraw sent an email with a Bill of Lading attached to J.C. and J.C.
5 | forwarded a copy of a Bill of Lading to H.G. The Bill of Lading,
6 | bearing what appeared to be the signature of Daniel Chartraw as
7 | "shipper," documented the shipment of the gold to J.C. via Hellman
8 | Worldwide Logistics. H.G. was reassured by Chartraw that his loan
9 | would be safe as the Bill of Lading demonstrated Chartraw had sent the
10 | collateral to J.C. H.G. then agreed to loan Chartraw $75,000.
11 | Chartraw told H.G. he was using an attorney by the name of J.H.,
12 | located in Folsom, California, to facilitate the transaction and sent
13 | H.G. an email with instructions to wire transfer the $75,000 to an
14 | escrow account, number XXXXX9731, maintained by J.H. at JP Morgan
15 | Chase. H.G. wired the money from his TD Ameritrade account on or
16 | about June 7, 2011, to the escrow account maintained by Hoffman at JP
17 | Morgan Chase. J.C. never received the gold shipment and Chartraw
18 | never repaid the money loaned to him by H.G.
19 |         11. J.C., a resident of Miller Place, N.Y., stated that he
20 | became acquainted with Chartraw in approximately March 2011. Chartraw
21 | told J.C. he was asset rich but cash poor and that he desperately
22 | needed a bridge loan for the purpose of making a lease payment on a
23 | piece of mining equipment that his business relied upon. Chartraw
24 | told J.C. he would repay the loan in two weeks, but in any case, not
25 | more than 30 days. He told J.C. he needed to borrow $100,000.
26 | Chartraw told J.C. he would ship J.C. gold bars that J.C. could hold
27 | as security until Chartraw paid him back. Chartraw stated he would
28 | ship the bars "tonight" and thereafter emailed J.C. a Bill of Lading

4

1  indicating the bars were in transit to J.C.'s home address in New
2  York.  J.C. told Chartraw that he wanted to see the gold first, before
3  loaning him money.  Chartraw pleaded to J.C. to loan him the money
4  quickly, as time was of the essence.  He told J.C. the gold would take
5  three days to arrive in New York but that the lease payment on the
6  mining equipment had to be made immediately.  J.C. agreed to loan
7  Chartraw $25,000 and did so on June 6, 2011, by transferring $25,000
8  he held in his account at JP Morgan Chase directly to Chartraw's
9  account, number XXXXXX9335, at JP Morgan Chase.  J.C. did not receive
10 the gold shipment and Chartraw did not repay the $25,000 or the
11 interest owed to J.C.
12      12.  H.G. provided me with a copy of the Bill of Lading
13 concerning the gold shipment.  A review of the Bill of Lading, dated
14 June 6, 2011, indicates that 5.15 kilos of gold was shipped on June 7,
15 2011, from a bonded warehouse at the Port of Montana to [J.C.'s
16 address], Miller Place, N.Y., via Hellmann Worldwide Logistics.  The
17 Bill indicates the freight was counted and loaded by the shipper and a
18 Hellmann seal was affixed to the Bill indicating the shipment was
19 picked up on June 7, 2011.  A signature appears on the Bill of Lading
20 beneath the caption "Shipper Signature."  I am familiar with the
21 signature of Daniel Chartraw.  The signature appearing on the Bill of
22 Lading appears to be a signature consistent with that of Daniel
23 Chartraw.  I contacted a representative of Hellmann Worldwide
24 Logistics.  The representative told me there was no record of the
25 above described shipment ever existing and that the Bill of Lading was
26 fraudulent.
27      13.  I obtained and reviewed records from JP Morgan Chase,
28 via Federal Grand Jury subpoena, for accounts numbered XXXXX9731 and

1  XXXXXX9335. A review of these records revealed XXXXX9731 is an
2  account styled as [J.H.] Attorney at Law IOLTA Trust Account XXXX, E
3  Bidwell St., Ste XXX, Folsom, CA and XXXXXX9335 is an account styled
4  as Louise K. Chartraw or Daniel L. Chartraw or Mrs. Martha M.
5  Chartraw, XXX Mission St., Lodi, CA.

6      14. A review of the bank statement for account number
7  XXXXX9731 (J.H.) indicates that a deposit of $75,000 was received into
8  this account on June 7, 2011, by Fed Wire Credit for the benefit of
9  H.G. The statement reflected a beginning balance of $105.40 prior to
10 receipt of the $75,000. The statement indicates a withdrawal of
11 $75,000 on the same day and an ending balance of $105.40.

12     15. A review of the bank statement for account number
13 XXXXXX9335 (Chartraw) indicates a deposit of $75,000 was received into
14 this account on June 7, 2011. This statement also reflects a deposit
15 of $25,000 on June 6, 2011. As of June 7, 2011, the statement
16 reflects a balance in the account of $100,023. Also reflected in this
17 statement is a withdrawal, dated June 7, 2011, of $83,601.69. The
18 corresponding withdrawal slip indicates the $83,601.69 was used to
19 purchase a JP Morgan Chase cashier's check in the amount of
20 $83,601.69, made payable to Butts Cadillac. The withdrawal slip also
21 bears the printed name of Daniel Chartraw as the purchaser of the
22 cashier's check. The balance in this account following the withdrawal
23 of the $83,601.69 was $15,922.

24     16. I contacted Butts Pontiac Cadillac, Inc. and
25 interviewed office manager L.M. L.M. told me the $83,601.69 cashier's
26 check was used by Daniel Chartraw to purchase a 2011 Cadillac
27 Escalade, VIN 1GYS4JEF1BR263641.
28 ///

17. I interviewed C.P., car salesman, Butts Cadillac. C.P. told me he was the sales representative that sold the Cadillac Escalade to Chartraw. He told me Chartraw came into the dealership on several occasions and that he had lengthy discussions with Chartraw. I transmitted, by email enclosure, a photo lineup of six parties to C.P. C.P. received the photo lineup as I spoke to him on the telephone. Within ten seconds of first viewing the photo lineup, C.P. told me that photo number 4, first photo on the left, second row, was a picture of the man known to him as Daniel Chartraw. Photo number 4 is known to me to be a picture of Chartraw.

**The Dore Bar Investment:**

18. On February 6, 2012, I interviewed J.F.C., a resident of North Carolina.

19. J.F.C. told me that in 2010 he entered into a series of phone conversations with Daniel Chartraw and Leslie Gilbert regarding the possible purchase of unrefined precious metals from Chartraw and Gilbert.

20. Chartraw and Gilbert told J.F.C. they were officers of a company called AZ Rock Holdings (hereinafter, "AZ Rock"), and that AZ Rock possessed powdered minerals and Dore bars containing precious metals. Chartraw and Gilbert told J.F.C. that if J.F.C. paid AZ Rock $1 million he and his partners could make a profit of $3 million by having the bars refined and the precious metals extracted.

21. On November 22, 2010, J.F.C., relying on representations made to him by Chartraw and Gilbert, caused his attorney, B.C., to wire $1 million from his client trust account at Regions Bank in North Carolina to an escrow account controlled by 1st

7

National Title Insurance Agency (hereinafter, "1st National"), maintained at JP Morgan Chase Bank in Orem, Utah.

22. I obtained, by Federal Grand Jury Subpoena, the escrow file from 1st National regarding the above referenced escrow account. A review of the escrow file indicated that 1st National received a document entitled "AZ Rock Holdings, LLC ... Letter of Introduction and Mandate Authority." This letter bears the signatures of L.N. and Daniel Chartraw, both as "Principle/Partner" of AZ Rock Holdings, and purportedly authorizes Leslie Gilbert to enter into "all aspects of business dealings" on behalf of AZ Rock Holdings. Further, the escrow file contained bank account records in the form of account statements, cancelled checks, and wire transmittal statements. The file also contained numerous emails and letters, all bearing the signature of Leslie Gilbert. Those emails and letters instructed officers at 1st National to disburse all of the monies held in the escrow account to persons or entities named by Gilbert, including himself and Daniel Chartraw.

23. I interviewed L.N., the owner of AZ Rock Holdings, LLC, 11411 N 91st Avenue, Peoria, Arizona. L.N. told me that Daniel Chartraw was not a partner or owner in AZ Rock and neither Chartraw nor Leslie Gilbert had authority to act for AZ Rock. L.N., after reviewing the AZ Rock Holdings, LLC, Letter of Introduction and Mandate Authority I provided to him, stated his signature appearing thereon was a forgery. L.N. told me he had agreed to sell J.F.C. and his partners a quantity of Dore bars but had never received, nor had he ever known about, the $1 million sent by J.F.C.'s attorney to 1st National Title.

8

24. The escrow file contained bank account records pertaining to an escrow account opened by 1st National at JP Morgan Chase Bank. A wire statement among those records revealed that on November 22, 2010, a wire transfer, sent via Fed Wire, in the amount of $1,000,000, was received into the escrow account from the account of B.C. at Regions Bank, North Carolina, for the benefit of AZ Rock.

25. The escrow file also contained a copy of a document entitled "Escrow Disbursement Instructions," bearing the signature of Les Gilbert, which read as follow: "I Les Gilbert, as an authorized representative of AZ Rock, LLC, do hereby instruct 1st National to cause to be released the following amounts from the escrow I had previously opened for the purchase of real property. The amounts are as follows: ..... $400,000 shall be transferred to [J.H.'s law firm], Attorneys for Daniel L. Chartraw wire coordinates attached hereto .... $98,000 shall be transferred to Daniel Chartraw at his account as follows: Chase Bank 2445 W Kettleman Lane, Lodi, CA 95242" Account Name Daniel L. Chartraw, Account # XXXXXX9335...."

26. Also found in the escrow file were copies of five emails, dated 12/23/2010, 12/31/2010, 1/14/2011, 1/26/2011, and 3/16/2011, addressed from Leslie Gilbert to employees at 1st National, directing those employees to disburse monies from the escrow account in the amounts of $5000, $5000, $10,000, $5000, and $8000, respectively, to "Daniel Chartraw's account at Chase...account number XXXXXX9335." Copies of wire payment records provided by JP Morgan Chase, corresponding with the above five noted disbursement requests, were also found in the escrow file.

27. The escrow file also contained a copy of a memo addressed to Daniel Chartraw from J.H., dated October 4, 2010, which

9

read in part "....any monies received in this account will be deemed as received by Daniel L. Chartraw... receiving institution information Chase Bank 1012-1 Riley Street Folsom, CA ... account number XXXXXX7310."

28. Bank records were obtained via Federal Grand Jury subpoena regarding JP Morgan Chase accounts XXXXX9731 and XXXXXX9335. Review of these records indicated that all of the above noted monies as requested to be disbursed to either J.H.'s firm ($400,000) for the benefit of Daniel Chartraw or to Chartraw at Chase Bank in Lodi ($132,000) were thereafter spent by Chartraw at his direction or by him personally. None of these monies were used to build a refinery and none were directed to AZ Rock.

29. L.N., owner of AZ Rock, told me he was present when J.F.C. visited the AZ Rock facility in Phoenix, Arizona, and met personally with Chartraw and Gilbert for several hours, toured the AZ Rock facility, and observed the supply of Dore bars. As I interviewed L.N. on the telephone I transmitted to him, by email attachment, a photo lineup of six parties. L.N. opened the attachment and immediately identified the picture therein known to me as a photo of Daniel Chartraw as the same person known to L.N. as Daniel Chartraw and the same person who had met with J.F.C. when J.F.C. toured the AZ Rock facility in Phoenix.

30. J.F.C. told me that only 252 pounds of Dore bars were ever shipped to Belgium. Those bars were found to consist of 99% copper.

31. J.F.C. questioned Chartraw as to why the one ton of bars was not shipped. Chartraw blamed L.N. L.N. told me that he never shipped the one ton of bars because he never knew the $1 million

10

payment had been received by Chartraw and Gilbert. According to J.F.C. Chartraw has broken off communication with J.F.C.

32. Fed Wire, also known as the Federal Reserve Wire Network, is a computerized funds transfer system maintained by the Federal Reserve. All monies transmitted via the Fed Wire system are moved via electronic signals through the Federal Reserve information center located in East Rutherford, N.J.

### V. Chartraw's Fugitive Status

33. On September 1, 2011, two warrants, with bail set at $250,000 each, were issued by a Superior Court Judge in Salinas, California, based on Chartraw's failure to appear regarding felony charges of grand theft and embezzlement concerning allegations involving the swindling of an elderly resident of Carmel, California, by promising a return on an investment associated with a gold mine and felony charges concerning allegations of corporal injury on a spouse. Chartraw had been free on bond at the time he failed to appear at hearings on both charges and became a fugitive; he is currently at large.

### VI. Conclusion and Request for Sealing

For the foregoing reasons, I respectfully request that the Court issue a criminal complaint and arrest warrant for Daniel Chartraw.

I further request that the Court order that this affidavit, complaint and arrest warrant remain under seal until order of the Court. Without such an order, the defendant may be alerted to the federal investigation, learn of the extent of the government's knowledge of his activities, become harder to locate, and place

///

///

Case 2:12-mj-00051-KJN   Document 1   Filed 02/21/12   Page 13 of 13


pressure on potential witnesses to not cooperate, or otherwise impede the ongoing investigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_/s/ Richard J. Snodgrass_
Richard J. Snodgrass, Special Agent
Federal Bureau of Investigation

Approved as to form:

_/s/ Michael D. Anderson_
Michael D. Anderson
Assistant U.S. Attorney

Subscribed and sworn to before me
This 21st day of February, 2012

_/s/ Kendall J. Newman_
Honorable Kendall J. Newman
United States Magistrate Judge

12